# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83765-6-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| K.J.B., | |
| Appellant. | |

ANDRUS, J.P.T. — K.J.B. appeals the juvenile court's revocation of his suspended "Option B" disposition under RCW 13.40.0357, for his noncompliance with the conditions of that disposition. K.J.B. contends the court abused its discretion in revoking his suspended disposition because his violations were merely "technical" in nature and the court did not meaningfully consider mitigating factors, the possibility that its own potential implicit racial bias may have affected the court's judgment, the history of racial disparities in JRA custodial dispositions, or the need for a sanction other than incarceration to remedy racial disparities.

Based on the record before this court, we cannot conclude that the revocation was based on untenable reasons or outside the range of acceptable choices. We therefore affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

<u>FACTS</u>

At the age of 14, K.J.B. was convicted of attempted robbery in the second degree, theft in the first degree, and possession of stolen property in the third degree.[1]  In June 2020, while K.J.B. was serving a deferred disposition for these crimes, he and a friend assaulted and robbed a man as he was leaving a bank. The State charged K.J.B. with first degree robbery.[2]

In August 2020, the juvenile court released K.J.B. from electronic home monitoring to allow him to get a job and engage with a mentor from Northwest Credible Messengers, an organization whose primary goal is to make connections with youth who, without support, would enter into the criminal justice system.[3] When the court held a review hearing a month later, it learned K.J.B. had neither obtained employment nor connected with a mentor at Credible Messengers.  The court approved the recommendation of K.J.B.'s Juvenile Probation Counselor (JPC), Kristin Bennett, to refer K.J.B. to Youth Link, a different mentorship organization, as a way to encourage K.J.B.'s engagement.  At this hearing, K.J.B.'s mother reported that K.J.B. would start school on September 9, 2020.  The court informed K.J.B. that it expected him to make a connection with Youth Link and to attend school.  It scheduled a review hearing for October 1, 2020 to verify his compliance.

At the October 1, 2020 hearing, K.J.B. did not appear and neither his attorney nor the JPC was able to contact him.  The State requested a failure to

---

[1] King County Superior Court No. 19-8-00547-7.
[2] King County Superior Court No. 20-8-00596-9.
[3] NORTHWEST CREDIBLE MESSENGERS, https://northwestcrediblemessenger.org.

appear order and a bench warrant for his arrest, but the court denied this request and continued the hearing for a week. On October 8, 2020, at the rescheduled hearing, the court learned from the JPC that she had had difficulty reaching K.J.B. and that his lack of contact was impeding her efforts to connect him with services. The court also learned that while K.J.B. was enrolled in school, he was experiencing difficulties with his laptop working properly and logging into the school's electronic system. The JPC, K.J.B.'s mother, and the court all acknowledged that many of the difficulties K.J.B. was confronting were not his fault. The court set the next review hearing for October 30, 2020.

At the October 30 hearing, K.J.B.'s outreach worker, Andy Pacificar, reported that K.J.B. had recently begun engaging with him, that he had provided a phone to K.J.B. to ensure they could remain in communication, and that K.J.B. had indicated a desire to make changes. K.J.B.'s mother reported that her son was "doing great" at home, but continued to struggle with school. She stated she was looking to enter K.J.B. into a different school program because of issues she continued to have with his teachers. She also informed the court that K.J.B. was starting a parenting class with his girlfriend to prepare them for the birth of their child. The court ordered the parties to attend a case setting hearing on December 1, 2020.

The next hearing we have in the record occurred on February 26, 2021, at which time K.J.B. pleaded guilty to an amended charge of second degree robbery. K.J.B. admitted that "[o]n June 30, 2020, in King County, WA, I unlawfully and with intent to commit theft participated in taking personal property which was cash from

[T.C.] by the use of force and injury to him. We took the money by hitting and kicking him."

The parties presented the court with a negotiated plea agreement that represented a "package plea" deal for K.J.B.'s two cases. The negotiated plea included the revocation of a deferred disposition in K.J.B.'s 2019 case and a standard range sentence of 52 to 65 weeks in a juvenile rehabilitation facility, to be suspended for 12 months, on the condition that K.J.B. "[e]ngage with Kent Youth and Family, [e]ngage with YouthLinc or equivalent mentorship program per JPC approval, and attend school regularly and without incident." The plea agreement stated that "[t]his negotiated plea agreement contemplates that these latter conditions are of particular importance in complying with the Option B." K.J.B. signed this plea agreement.

Before accepting the recommended disposition, the court noted that the JPC had previously recommended against an Option B suspended disposition and asked her to explain why she had changed her mind. The JPC stated that her previous recommendation was based on K.J.B.'s failure to communicate and engage with his mentor and to attend his parenting classes. In the weeks leading up to this disposition, however, she indicated that K.J.B. had picked up his engagement with Pacificar, attended two parenting classes, and was communicating more consistently with her. Pacificar echoed these sentiments.

The court decided to accept the joint recommendation, explaining that

> Ms. Bennett's former recommendation really gave the court pause about the option B. I think it's fair to say that over the time that this case has been pending, there has not been a level of engagement that I would want to see for the option B until very recently. I'm

getting this more positive report from Ms. Bennett and Mr. Pacificar. It gives the court a basis on which to conclude that the option B could be successfully completed, as opposed to kind of a more pessimistic outlook.

The juvenile court sentenced K.J.B. to the standard range of 52 to 65 weeks, but suspended it for 12 months. The order included the following finding:

The court further finds and concludes that the youth is amenable to treatment in the community and that the interests of the community will be furthered by the suspended disposition, *so long as the respondent fully complies with the conditions of supervision imposed in this order.*

(Emphasis added.)

The court imposed a number of conditions with which K.J.B. was required to comply, including maintaining contact with his JPC; living in approved housing; obeying criminal laws; refraining from the possession or use of any controlled substance except by prescription; attending school with no suspensions, expulsions, behavioral referrals, tardiness, or unexcused absences; and submitting to random urinalysis (UA) testing. The court also ordered K.J.B. to obtain a substance use evaluation if any UA was positive and to engage with an approved mentorship program. And as K.J.B. had agreed to do in the negotiated plea agreement, the court ordered him to attend school regularly.

We have no record of what, if any, court oversight K.J.B. had during the eight months between the date of his disposition order in February 2021 and on November 2, 2021, when the court held a review hearing at the JPC's request. At this hearing, the prosecutor represented to the court that "[K.J.B.] is not engaging in any of the services or following through with any of the agreement as agreed upon outlined in his option B suspended sentence." The prosecutor noted that the

State was not moving to revoke the suspended sentence at that hearing, but warned that "if he continues to disregard the agreement that was made for his suspended sentence, the State may note a motion for revocation." The prosecutor asked the court to "remind [K.J.B.] of the benefits of his option B if we could."

The court stated it had received and reviewed a report from K.J.B.'s probation counselor and stated that it "[l]ooks like [she] had quite some contact with [K.J.B.] and his father trying to get this on a better track."[4] JPC Kris McKinney reported that she did not know "where we are," because K.J.B. was neither enrolled in school nor sure about his school status, K.J.B. had refused to engage with any new mentor after his last caseworker had left to take another job, and K.J.B. had tested positive for cannabis, but had failed to follow up with a substance abuse assessment, as required by the disposition order. K.J.B.'s father, who attended the hearing, informed the court that neither parent supported such an assessment.

The court explained to both K.J.B. and his parents that the substance abuse evaluation requirement was mandatory and a "deal breaker" for the court. It also noted that "this can get back on track and everything could ultimately work out well for [K.J.B.] as long as he goes to school and gets that drug and alcohol evaluation completed."

The juvenile court reviewed K.J.B.'s progress six weeks later, on December 14, 2021. The prosecutor who attended this hearing indicated that the State was not asking to revoke the suspended sentence that day, but asked the court to set

---

[4] None of the probation counselor reports to the juvenile court appear in the record before this court.

a revocation hearing for two weeks later, when the assigned deputy prosecutor would be available. Once again, the court noted it had received and reviewed a report from the JPC, in which she summarized concerns about K.J.B.'s lack of progress, particularly in attending school and obtaining substance use treatment or counseling.[5]

The JPC reported orally at this hearing that she was recommending that K.J.B. obtain outpatient treatment, a recommendation that K.J.B.'s parents apparently resisted. The JPC suggested that an alternative would be for K.J.B. to begin a drug education program through the court and hoped that if K.J.B. started attending school regularly, his substance use would decrease simply because he would be "otherwise occupied." She believed the court needed some assurance that K.J.B.'s drug use was not getting in the way of his success at school.

K.J.B.'s mother reported that she had enrolled her son in an alternative education program at Youth Source to help K.J.B. obtain a GED and that he was set to begin that program on January 3, 2022.[6] The court informed K.J.B. and his mother that the JPC's recommended drug education program was one that K.J.B. "could immediately do and demonstrate to everyone that he's willing to do it. And it doesn't sound overly taxing. It would be just an initial step." It noted that "the State just said that they want to move to revoke the option B. What that means . . . if that were ever granted, [is] that he would go to JRA." The court reminded K.J.B. that he had "a limited amount of time" and if he began the drug education program

---

[5] This JPC report, like the others reviewed by the trial court, is not in the record.
[6] K.J.B.'s mother explained their efforts to enroll him in school, noting that they had been rejected by one school that reportedly could not accommodate his learning disability and Individual Education Plan.

with his JPC's help, "it could show that other piece that we're looking for to demonstrate compliance with option B." When K.J.B.'s mother indicated her consent, the court stated it was "going to ask [the JPC] to get that going." The court indicated

> for purposes of today's hearing, let's note that he's scheduled to start school on January 3rd at Youth Source in Tukwila. . . . Also, the court wants him to begin some outpatient treatment regarding [cannabis] use and education, that [the JPC] has a program that he could start immediately. I would like to see him do that. If there is some other alternative that is immediately available, that would be comparable. In other words, I think that would be just as good. The issue here is not spending a lot of time searching but actually starting something. That's what I'm trying to emphasize. So, I'd like the order to reflect those two things. That appears to be where we are today.[7]

The court confirmed with K.J.B. that he understood its ruling and said "I hope you get what's going on here because you've been given this option B opportunity to avoid going to JRA, and there were requirements of you to do that. And the report was that there [are] problems with you meeting the requirements, there were things you weren't doing." The court emphasized how important it was for K.J.B. to follow through and noted that "the most important, the big two, are go to school and get some counseling on drug use." K.J.B. confirmed on the record that he understood the court's ruling.

At some point before February 16, 2022, the State notified the court and K.J.B. of its intent to move to revoke his suspended sentence. At the February 16 hearing, the prosecutor reported that the State's motion was based on a JPC report alleging that (1) K.J.B. had failed to engage and participate in educational

---

[7] If an order was entered at the conclusion of this review hearing, it was not provided to this court.

programming, and (2) K.J.B. had failed to engage in and participate in a substance abuse disorder program.[8] K.J.B., through counsel, denied the allegations.

The State called JPC McKinney to testify about K.J.B.'s noncompliance. McKinney testified that when she took over the case in 2021, she learned he had a "history of resistance" to participating in services. McKinney stated that in the summer of 2021, K.J.B. tested positive for cannabis and had initially refused to complete a drug assessment, claiming that his use was not causing any problems. She also indicated that they brought the issue to the court's attention because there were concerns his drug use was a roadblock to him successfully engaging in education. As a result, she noted, the court ordered K.J.B. to obtain a drug use assessment. McKinney confirmed that K.J.B. completed this assessment and that the evaluator recommended outpatient treatment. But, McKinney reported, K.J.B. did not comply with this recommendation. McKinney put K.J.B. in touch with a treatment provider, but K.J.B. did not follow up with this referral.

With regard to the school requirement, McKinney testified that K.J.B. was supposed to begin school with Youth Source at the beginning of 2022, that she had been speaking with K.J.B. about his school requirement on a weekly basis, and she also spoke to his Youth Source case manager to find out what K.J.B. had done to comply. She learned that K.J.B. had only called the case manager for the first time a week before the revocation hearing, despite the earlier representation from his mother that he was to start on January 3, 2022. McKinney testified that K.J.B. was supposed to meet his case manager weekly, but had not done so.

---

[8] This JPC report is also not in the record.

When K.J.B. finally contacted him, the case manager assisted K.J.B. in setting up an account online so that he could verify that K.J.B. was doing assigned schoolwork. But, as of the day of the revocation hearing, McKinney testified that K.J.B. had completed no schoolwork.

K.J.B. provided McKinney some screen shots hours before the hearing allegedly demonstrating that he had completed some online school tests, but she verified with the Youth Source case manager that the account he had created with K.J.B. the week before showed that no work had been done. The case manager recommended that the JPC obtain K.J.B.'s account name and password to log into the account to verify the status of his school assignments. McKinney confirmed that her conversation with the case manager was set out in her report to the court.

K.J.B. testified at the revocation hearing and admitted he had not done any outpatient treatment, despite the court order and the evaluation recommendation. But he and his parents testified that he had completed some schoolwork online. Despite this testimony, K.J.B. had no recollection of any details of any assignments he had completed. After the State asked K.J.B. to provide his online school login information, JPC McKinney testified on rebuttal that she logged into his account and confirmed that he had not started any of his assigned schoolwork.[9]

Based on this evidence, the court found the State had proven the alleged violations. The State recommended revocation as a result. The prosecutor explained to the court that K.J.B. entered the juvenile system three years earlier

---

[9] K.J.B. and his mother testified that he had previously used a different account to complete his work, but that he had to "start all over" the week prior to the revocation hearing. The State challenged the credibility of this testimony given that K.J.B. had also testified that he had had no login access until the week before the hearing.

with "phone snatches [and] robberies," some of which he had committed with his brother. The prosecutor argued that "we tried to make it work in the community. So we reduced those charges, we wrapped them all together into a deferred disposition with the hope that he would finally, because schooling and treatment was already an issue for him, that he would finally get started with them." Then, "just a couple of months into that, he goes out and does this [robbery]." The prosecutor noted how violent this robbery was and that K.J.B was "already on probation and trying to have services delivered on multiple other robberies." He argued:

> So at the time we crafted this resolution, Your Honor may remember that there were a number of hearings where it was made very clear that we weren't going to be ready to proceed with this option B until all of these pieces were in place, until a mentorship was in place, because [K.J.B.] and his family didn't want to engage in Community Passageways, there was a question about Credible Messengers. That ended up falling through for lack of engagement. Youth Link ended up falling through for lack of engagement in terms of mentorship.
>
> But then we also needed to make sure that schooling was in place and treatment were in place. These were made explicit to [K.J.B.] before we even reduced this case to put it on an option B. So for a year, he's known these were critical issues. And I think in fact at that hearing, we also made clear we won't hesitate to move for revocation, [K.J.B.]. You have too much other history. And this was a very serious offense.

After many months, the prosecutor argued, K.J.B. has never really complied. While he had made "minor, half-hearted efforts at the last second to avoid getting in trouble," there had never been any "real compliance," despite being warned multiple times that he faced a year in JRA. The prosecutor stated that the Option B alternative was to ensure a juvenile can obtain services in the community, but the State had exhausted all its efforts to do so in this case.

- 11 -

K.J.B. asked the trial court not to revoke the suspended sentence, arguing that he had not fallen out of contact with his JPC, had spent a lot of time with his daughter learning to be a parent, and had managed to "stay away from getting arrested." While K.J.B. struggled to comply with the schooling requirement, he maintained it was not his fault because he did not have the ability to enroll himself in school, did not have his own phone, and had to rely on his parents to engage with services. Rather than revoke, K.J.B. asked the court to give him one more chance by ordering him to engage in school, to provide proof of therapy check-ins, and to meet with the substance abuse service provider McKinney had previously identified. Counsel asked the court to extend the suspended sentence for two months to give him time to show he was "actually taking this seriously."

JPC McKinney, like the prosecutor, argued that revocation was the appropriate sanction given that K.J.B. had made no effort to contact a service provider available at the court who could have provided him with a cell phone, supplies for his daughter, and basic education on outpatient counseling. McKinney also noted that despite K.J.B. arguing he had trouble accessing schoolwork online, the school was holding in-person sessions twice a week that students were required to attend and K.J.B. had not attended a single in-person session.

In response to K.J.B.'s request that the suspended sentence be extended past the 12-month deadline, the State argued that the court lacked the authority to take such a step. The court sought briefing from the parties regarding the legal issue and set a hearing for the following day.

After considering the parties' respective requests and supplemental briefing, the juvenile court reiterated its findings that K.J.B. had willfully violated the supervision conditions of the Option B disposition. It concluded that the statute was not clear as to whether the court had authority to extend an Option B disposition past the 12-month period, but indicated it did not need to resolve the issue because it had decided to revoke rather than extend it. It reasoned:

> I looked a lot at the principles of the Juvenile Justice Act. . .. There's kind of two principles in play. One is [to] make the juveniles accountable for the criminal behavior. And the second is this urge and goal that it be handled in the community when possible.
>
> What I've concluded in this situation is that it just has not been possible. It has not been possible to have an accountability piece in the community. Over a year now, we've tried. We've tried to do that. And I think the failure just demonstrates that it's not workable. And when I look back and ask myself what happened with the option B, what happened, where are we today versus where we were a year ago in February, perhaps the biggest weakness is the finding that [K.J.B.] was amenable to treatment in the community. I guess I learned at the hearing yesterday that, in negotiating this, the parties did have some concern that it might not work. Still, though, I think it was important to try. That is the goal of the Juvenile Justice Act.

The court also made it clear that K.J.B.'s lack of performance "was not on small items, and it was not hiccups." The court stated that it did not intend to hold K.J.B. "to the letter of some small requirement and based on that find that he didn't comply." It found that "[w]hat we really have here is a total failure over the course of a year to do an option B that really was pretty minimal in its requirements," tailored to meet K.J.B.'s needs.

The court acknowledged the mitigating evidence before it:

> [K.J.B.] in particular has done really well becoming a father. And his parents talk a lot about the work that he's done there with his daughter. And I recognize that. I heard that. I'm proud of [K.J.B.]

- 13 -

for that. Still, I can't change the circumstances in which we find ourselves. The option B was urged on the court by [K.J.B.], and he had an obligation to complete it to avoid JRA.

The court ultimately concluded that K.J.B. was "just not amenable to meeting these objectives and responsibilities in the community" and reluctantly concluded that revocation was the appropriate outcome. K.J.B. appeals.

ANALYSIS

K.J.B. argues that the juvenile court abused its discretion when it revoked his suspended disposition for "technical violations" and failed to meaningfully consider mitigating factors, its own potential implicit racial bias or the history of racial disparities in JRA custodial dispositions, and the preference for sanctions other than incarceration to remedy these racial disparities.

Juvenile Justice Act Disposition Alternatives to Incarceration

The Juvenile Justice Act, ch. 13.40 RCW, has "the dual purpose of holding juveniles accountable and fostering rehabilitation for reintegration into society." *State v. Garza*, 200 Wn.2d 449, 460, 518 P.3d 1029 (2022) (quoting *State v. S.J.C.*, 183 Wn.2d 408, 421, 352 P.3d 749 (2015)). The act gives juvenile courts several tools to accomplish both goals, including imposing a deferred disposition under RCW 13.40.127, which allows a youth to plead guilty to a charged crime, to spend time under "community supervision" with the requirement that they fulfill certain court-imposed conditions and, if necessary, to obtain mental health or substance abuse assessments and treatment. RCW 13.40.127(5). At the conclusion of the specified period of supervision, if the court determines that the youth has complied with the terms of the deferment, the court dismisses the

disposition and vacates the youth's conviction. RCW 13.40.127(9); *State v. M.S.*, 197 Wn.2d 453, 459, 484 P.3d 1231 (2021).

A deferred disposition option is not available for youths who have been charged with a violent offense, who have a criminal history that includes any felony, or who have had a prior deferred disposition or adjudication. RCW 13.40.127(1)(a)-(c). K.J.B., on community supervision for a deferred disposition at the time he committed the robbery at issue in this appeal, was ineligible for that type of community-based disposition again.

The Juvenile Justice Act, however, provides other tools for courts to avoid imposing a custodial disposition, even for a youth with a prior criminal history. RCW 13.40.0357, the provision setting out juvenile offender sentencing standards, gives courts the discretion to impose what is known as an Option B Suspended Disposition as an alternative to incarceration.[10] An Option B disposition involves the imposition of a standard range disposition, but the court suspends it "on condition that the offender comply with one or more local sanctions and any educational or treatment requirement." RCW 13.40.0357(Option B (1)). "Local sanctions" can include a period of confinement of 30 days or less, community supervision of 12 months or less, community restitution of 150 hours or less, or a fine of $500 or less. RCW 13.40.020(19). If a youth is placed into "community supervision," a "mandatory condition" of that supervision is refraining from

---

[10] RCW 13.40.0357 was amended in 2022 to replace the term "marijuana" with the term "cannabis." LAWS OF 2022, ch. 16, § 8. These amendments do not affect the analysis here.

committing new offenses and complying with mandatory school attendance provisions of ch. 28A.225 RCW.[11]  RCW 13.40.020(5).

Willfully failing to comply with the conditions of a deferred or suspended disposition exposes the youth to sanctions under RCW 13.40.200 or revocation of the disposition.  RCW 13.40.127(7); RCW 13.40.0357(Option B (2)).  RCW 13.40.200 specifies two types of sanctions: detention for a period of up to 30 days, or for nonpayment of financial obligations, conversion of the monetary amount to some amount of community restitution.  RCW 13.40.200(3), (4).

The parties here agreed and the court consented to placing K.J.B. on an Option B suspended disposition on the condition that he attend school and obtain drug treatment if an assessment recommended it.  The juvenile court, when it revoked the disposition, found that K.J.B. had not complied with either condition at any time during the 12-month suspension period.[12]

### Standard of Review

Because the decision to impose sanctions or revoke the suspended disposition is squarely within the discretion of the juvenile court, we review this decision for an abuse of that discretion.  *See State v. McMillan*, 152 Wn. App. 423, 426-27, 217 P.3d 374 (2009) (citing *Spokane County ex rel. Sullivan v. Glover*, 2 Wn.2d 162, 165, 97 P.2d 628 (1940)) (When the legislature uses the word "may" in a statute, it is generally considered to be permissive and "operates to confer

---

[11] RCW 28A.225.010(1) provides that all children between the ages of 8 and 18 must attend a public school in the district in which the child resides, unless attending an approved private school, receiving home-based instruction, or attending an education center authorized by ch. 28A.205 RCW.

[12] K.J.B. has not assigned error to any of the juvenile court's findings and we accept them as true on appeal.  *State v. Avila,* 102 Wn. App. 882, 896, 10 P.3d 486 (2000).

discretion."). A court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or reasons. *State v. Lamb*, 175 Wn.2d 121, 127, 285 P.3d 27 (2012) (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). A decision is based on untenable reasons if it "'is based on an incorrect standard or the facts do not meet the requirements of the correct standard'" and is manifestly unreasonable if it "'is outside the range of acceptable choices given the facts and applicable legal standard.'" *Id.* at 127 (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)).

K.J.B. raises three arguments in this appeal. First, he argues that revocation was unduly harsh for the "mere technical violations" K.J.B. committed. Second, he contends the juvenile court did not meaningfully consider the mitigating circumstances K.J.B. confronted during the period of his suspended sentence. Third, K.J.B. maintains the juvenile court failed to consider its own potential implicit racial bias or the history of racial disparities in JRA custodial dispositions and the preference for sanctions other than incarceration as a way to remedy these racial disparities. We address each in turn.

<u>Characterization of K.J.B.'s Violations as "Mere Technicalities"</u>

K.J.B. contends that, at most, he committed "technical violations" of the disposition order that were insufficiently serious to warrant revocation of the suspended disposition. We disagree.

RCW 13.40.020(5) makes school attendance mandatory for any youth on community supervision. And the juvenile court told K.J.B. at every hearing that it was important for him to engage with school in order to avoid being sent to a JRA

- 17 -

facility. The court similarly warned K.J.B. that a failure to undergo a substance abuse assessment and then to participate in the recommended treatment would be a "deal breaker," emphasizing that his engagement in treatment was an essential requirement. The juvenile court did not consider K.J.B.'s noncompliance with these conditions to be mere "technical violations."

Nor did the juvenile court require "full and total" compliance with every condition of the suspended sentence, as K.J.B. argues on appeal. To the contrary, the record shows the court amended its expectations at each review hearing in light of the barriers or obstacles to compliance that K.J.B. and his JPC identified. When K.J.B.'s mentor—with whom he had developed a relationship—left to take another job, the court did not sanction K.J.B. for refusing to reengage with a different mentor or mentorship program. When K.J.B.'s mother reported having problems getting a school to accept K.J.B. and when she later reported that the online schooling options necessitated by the COVID-19 pandemic were difficult for K.J.B. to navigate, the court did not sanction K.J.B. for not attending school. It recognized the barriers that K.J.B., like many youth, was experiencing during the pandemic. But ultimately, after the JPC offered K.J.B. different opportunities to overcome each of the identified barriers to compliance, the court found K.J.B. still made no effort.

### Meaningful Consideration of Mitigation

K.J.B. argues the juvenile court did not consider the mitigation evidence he provided. He points out that he did not commit any new offenses while on community supervision, that he "stabilized his residence," and that he became a

responsible father to his infant daughter. K.J.B. also argues that his poverty, lack of access to technology, and his challenges in accessing school work online during the pandemic factored into his inability to comply with the conditions of his disposition. He urges us to conclude that the trial court did not meaningfully consider these facts before revoking his suspended disposition.

We recognize that when a trial court has the discretion to revoke a deferred or suspended disposition, there are limits to that discretion—the court should meaningfully consider any "uncontradicted evidence of rehabilitation and mitigation" and not rely solely on the seriousness of the underlying crime in making a revocation decision. *State v. Hawkins,* 200 Wn.2d 477, 497, 519 P.3d 182 (2022) (court abused discretion in denying motion to vacate felony conviction under RCW 9.94A.640 by not giving meaningful consideration to uncontradicted evidence of rehabilitation). But the evidence of K.J.B.'s efforts at rehabilitation was not uncontradicted and the record shows that the court gave meaningful consideration to the mitigation evidence K.J.B. presented.

For example, K.J.B. and his mother testified at the revocation hearing that he had experienced barriers to accessing the Youth Source education programs online. The State disputed this evidence. JPC McKinney reported to the court that "[t]here's always a discrepancy [between] what the family says versus what the school says. I have to go by the records provided by the school. Both Truman and Youth Source have provided me with records that show little to no engagement in the school process." She testified that she talked with K.J.B. repeatedly about how to reach the Youth Source case worker, but K.J.B. did not contact him until he

learned of the State's intention to revoke the suspended sentence. McKinney also disputed the suggestion that K.J.B.'s difficulty accessing schoolwork online was an actual barrier because the school required students to appear in person at least two days a week. Yet, McKinney said, K.J.B. failed to meet the attendance requirement.

The record also shows that K.J.B.'s attorney brought several mitigating factors to the juvenile court's attention at the revocation hearing. Counsel pointed out that K.J.B. had never lost contact with his JPC and had stayed out of trouble while learning to take care of his daughter. Counsel further argued that the school issues were not K.J.B.'s fault because he lacked the authority to enroll himself in school and had to rely on his parents, who acted as gatekeepers and "to some extent prevented him" from doing what the court asked him to do.

The court seriously considered these arguments, discussing many of them in its oral ruling. For example, the court congratulated K.J.B. on becoming a father and putting in the effort to be there for his daughter. And the court recognized that between October and December 2021, it had narrowed the conditions it asked K.J.B. to work on to "really emphasize the school and the substance use counseling." The court said that it had signaled "very clearly" that if he could focus on just those two expectations, "he could pull it off. He could course correct." The court ultimately concluded, however, that K.J.B. was not amenable to a "course correction" in the community.

While K.J.B. may disagree with the weight the juvenile court gave to what he identified as mitigating factors, we will not reweigh the evidence and substitute

- 20 -

our judgment for that of the juvenile court. *See State v. Salgado-Mendoza*, 189 Wn.2d 420, 427, 403 P.3d 45 (2017) ("A reviewing court may not find abuse of discretion simply because it would have decided the case differently.").

<u>Racial Disparity in JRA Dispositions and Revocation Decisions</u>

K.J.B. next argues the court abused its discretion in revoking the suspended sentence without addressing the possibility that its own potential implicit racial bias may be affecting the court's judgment and without understanding the history of racial disparities in JRA custodial dispositions and the need for sanctions other than incarceration to remedy these racial disparities.

We first take judicial notice of implicit and overt racial bias against Black offenders in this state and recognize that we are permitted to consider "historical and contextual facts" of this bias when deciding cases, even when an individual defendant presented no such evidence in the trial court. *Hawkins*, 200 Wn.2d at 501.

K.J.B. points to studies showing that "Black and Latinx children are disproportionately over-represented among youth convictions, discretionary decline, and auto decline cases." Heather D. Evans & Steven Herbert, *Juveniles Sentenced as Adults in Washington State, 2009-2019*, at 4 (2021).[13] And as Justice Stephen Gonzàlez noted in his concurrence in *State v. B.O.J.*, 194 Wn.2d 314, 332, 449 P.3d 1006 (2019), "[t]here is considerable evidence that bias results in harsher dispositions for children of color, and for girls of color in particular." (citing Wendy S. Heipt, *Courts Igniting Change: Girls' Court: A Gender Responsive*

---

[13] https://www.opd.wa.gov/documents/00866-2021_AOCreport.pdf.

*Juvenile Court Alternative*, 13 SEATTLE J. SOC. JUST. 803, 816 (2015)). Even after being sentenced, members of communities of color are "disproportionately subject to discretionary decisions concerning their eligibility for release to community supervision, dependent on services designed to aid in their reentry, and impacted by collateral consequences of their incarceration." Task Force 2.0 Research Working Group, *Race and Washington's Criminal Justice System: 2021 Report to the Washington Supreme Court*, at 41 (2021).[14] While none of the studies cited by K.J.B. directly evaluated racial disparities in discretionary revocation decisions, we accept that implicit racial bias is so common and pervasive that it inevitably exists "at the unconscious level, where it can influence our decisions without our awareness." *State v. Berhe*, 193 Wn.2d 647, 657, 444 P.3d 1172 (2019).

The more difficult question is how to address it. In *Henderson v. Thompson*, 200 Wn.2d 417, 434, 518 P.3d 1011 (2022), our Supreme Court applied the two-step inquiry from *Berhe* to determine whether racial bias affected a civil jury verdict. Drawing on GR 37, it held that, to ensure that a litigant has had the benefit of an unbiased and unprejudiced jury, the first step was for a trial court to ascertain whether an objective observer who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State, could view race as a factor in the verdict. *Id*. at 435. If such a prima facie showing is made, then the party benefitting from the alleged racial bias has the burden of proving that race did not affect the verdict. *Id.*

---

[14] https://digitalcommons.law.seattleu.edu/korematsu_center/116/.

This two-step *Berhe* inquiry can be extended to K.J.B.'s argument that race affected the decision to revoke his suspended disposition. But based on the limited record we have here, we cannot conclude that K.J.B. has established a prima facie case. Unlike *Henderson*, there is no record that the judge, any attorney, JPC, or service provider used language that could evoke harmful stereotypes of Black children. To the contrary, the record suggests that every participant at every hearing sought to help K.J.B. avoid incarceration and considered that sanction as the absolute last resort.

The juvenile court in this case was confronted with a young individual who had been given not one, but two chances in two separate cases to avoid incarceration, to remain in the community, to live with his parents, and to help raise his child with the support of mentorship services, educational programming, and drug treatment. The court, over several hearings, explained its expectations and the consequences of not meeting these expectations. When the court realized K.J.B. was struggling to comply, it reduced its expectations in light of his personal circumstances. In December 2021, it told K.J.B. that to avoid a revocation and thus incarceration, all he had to do was start educational programming with Youth Source—a program his mother had identified and supported—and connect with a service provider to obtain counseling about his use of cannabis.

Yet, despite the efforts of the court, the JPC assigned to this case, and service providers who were willing to help him, K.J.B. did not start the Youth Source program and did not participate in the counseling services the JPC arranged for him. Based on this record, K.J.B. has not established that an

objective observer aware of implicit, institutional, and unconscious bias could view his race as a factor in the court's decision to revoke his suspended sentence.

K.J.B. cites to this court's decision in *State v. Quijas*, 12 Wn. App. 2d 363, 373, 457 P.3d 1241 (2020), to argue that "[w]hen a juvenile court sentences a youth of color, it must be aware of how its sentence will impact disproportionate punishment." Although the argument is not altogether clear, he appears to suggest that the juvenile court must make some statement on the record to the effect that its disposition decision will not result in racial disparities in sentencing youth of color.

While we see the benefit of putting this analysis on the record, *Quijas* imposes no such requirement. In that case, Quijas was charged with second degree murder at the age of 15. *Id*. at 365. When the State moved the juvenile court to decline jurisdiction so that Quijas could be prosecuted in adult court, he presented evidence that juvenile court jurisdiction is declined, both in Skagit County and statewide, in a racially disproportionate manner. *Id.* at 367.

The juvenile court granted the State's motion without addressing Quijas's claim of discriminatory practices. *Id.* at 368. This court held that the juvenile court was required to rule on Quijas's claim that the declination process was tainted by racial prejudice. *Id.* at 373. In addressing Quijas's equal protection claim under article I, § 12 of the Washington Constitution and the Fourteenth Amendment to the United States Constitution, we held that

> Our Supreme Court has made clear that trial courts must be vigilant in addressing the threat of explicit or implicit racial bias that affects a defendant's right to a fair trial. We hold that equal vigilance is required when racial bias is alleged to undermine a criminal

defendant's constitutional rights at any stage of a proceeding. When confronted by such a claim, supported by some evidence in the record, the trial court must rule.

*Id.* at 375.

*Quijas* is distinguishable in that K.J.B. did not raise an equal protection claim below and the juvenile court did not refuse to address any argument he did raise. The holding in *Quijas* is not applicable to this case.

<u>Availability of Less Severe Sanctions</u>

K.J.B. next argues that the juvenile court abused its discretion in imposing the "harshest remedy possible"—incarceration—without seriously considering less severe sanctions. We reject this argument for two reasons. First, while the Juvenile Justice Act permits progressive discipline, it does not mandate it. The juvenile court could have set more regular review hearings to ensure that K.J.B. understood the consequences of noncompliance. And the court certainly did not need to wait until the eve of the disposition's expiration to take corrective measures when a pattern of noncompliance began to emerge. Earlier intervention and earlier imposition of sanctions may have helped K.J.B. realize that the choices he was making had serious consequences. But the juvenile court, with the ability to speak directly to the youth and his parents and to observe them as they interacted with counsel, the JPC, and the court itself, is in the best position to decide if a less severe sanction before or in lieu of revocation would have convinced K.J.B of the need to act to avoid incarceration.

Second, the juvenile court did consider a less severe sanction at K.J.B.'s request. He asked for an extension of the suspended sentence with additional

- 25 -

reporting requirements and the court took that request under consideration. Ultimately, the court concluded that any lesser sanction would be futile. It was not an abuse of discretion, based on this record, for the juvenile court to conclude that giving K.J.B. another opportunity to demonstrate compliance was unlikely to achieve any different outcome.

Finally, K.J.B. contends that the court "conflated accountability with punishment" and impermissibly concluded that it had to imprison K.J.B. in order to hold him accountable. He argues that the word "accountability" as used in the Juvenile Justice Act does not require punishment in a JRA facility. But this is somewhat of a "straw man" argument—the juvenile court did not say that the only way K.J.B. could only be held accountable was through incarceration. What the juvenile court actually said was that it had tried a community-based alternative to incarceration and it had not worked because K.J.B. was not amenable to treatment in the community.

Because the revocation was not based on untenable reasons or outside the range of acceptable choices given the facts and applicable legal standard, there was no abuse of discretion. We affirm.

_Andrus, J.P.T._

WE CONCUR:

_Birk, J._       _Smith, C.J._